### In re B J & S CONSTRUCTION, INC., Debtor.

**Bankruptcy No. 5–88–00257.**

United States Bankruptcy Court, W.D. Kentucky.

Jan. 13, 1989.

———

L.M. Tipton Reed, Jr., Mayfield, Ky., for debtor.

James B. Brien, Jr., Mayfield, Ky., for Marie Courtney.

Michael B. Stacy, Bardwell, Ky., for Bardwell Deposit Bank.

## MEMORANDUM OPINION

J. WENDELL ROBERTS, Bankruptcy Judge.

This Chapter 11 case is before the court upon motion of Bardwell Deposit Bank (hereinafter, "Bank") for an order directing the distribution of funds from the sale of the debtor's mortgaged equipment. An objection to the Bank's motion was filed by the creditor Marie Courtney (hereinafter, "Courtney") and a hearing thereon was conducted on September 27, 1988. Memoranda in support of these creditors' respective positions have been filed and reviewed. For the reasons set forth below, we will sustain Courtney's objection, and further will direct that proceeds from the sale of collateral in which she held a secured interest be distributed to her.

The facts giving rise to the instant motion are fairly straightforward and may be briefly summarized as follows. The debtor is a corporation which was formed by Benny Crawford (hereinafter, "Crawford") in 1986. Prior to the debtor's incorporation, Crawford and his wife, Renda, had obtained several loans from the Bank for the purpose of conducting Crawford's construction business. Once the debtor was incorporated, it assumed certain of these loans, totalling approximately $350,000. The debtor subsequently fell behind in making payments on the loans as they became due, and by June 1987, past due interest on the assumed loans amounted to approximately $50,000.

In April and May 1987, a series of discussions regarding the loans' delinquent status took place between Crawford and the Bank's president, Joe Watson. At that time, Watson suggested that Crawford secure additional financing from an alternate source in order to cure the interest arrearage. Although he attempted to obtain such financing from a number of other banks, Crawford was unable to do so and ultimately, at the behest of Watson, approached his mother-in-law, Marie Courtney, for the needed funds.

At that time, Mrs. Courtney had her life savings, approximately $100,000, in certificates of deposit at the Bank. In response

to Crawford's request, Mrs. Courtney, a 69 year old widow of limited means, indicated that she would like to loan him the $50,000 but that she could not do so unless she received interest thereon. Her most urgent and overriding concern, however, was that her loan be "made safe," meaning that she would not make the loan unless it was fully secured by sufficient collateral. Crawford offered to attempt, to obtain as security two graders and a dozer, which he valued at approximately $55,000. Because the equipment had been previously pledged as collateral to the Bank for earlier loans it had made to the debtor, and because he believed that the value of the collateral would be insufficient to fully secure the debt owed the Bank and the debt to Courtney, Crawford believed that it would be necessary for him to obtain the bank's permission to subordinate its lien to the proposed lien of Mrs. Courtney. Otherwise Courtney would not be fully secured.

On June 1, 1987, Mr. and Mrs. Crawford and Mrs. Courtney approached the Bank's president, Mr. Watson, about the possibility of Courtney's obtaining a lien on the dozer and graders, in consideration of her loan of $50,000 to cure the interest arrearage. Watson indicated that he would consent to Courtney's obtaining a lien on the property, although he made no express representation as to whether Courtney's lien would be junior or senior to the bank's lien on the same equipment. Undeniably, Courtney and the Crawfords believed that Watson had agreed to subordinate the Bank's lien. At the conclusion of this discussion, Watson instructed Sammy Todd, the Bank's vice president, to prepare for the Crawfords a promissory note and security agreement in favor of Courtney. Listed as collateral therein are the two graders and the dozer.

At the same time he prepared Courtney's note and security agreement, Mr. Todd also prepared a second promissory note and security agreement in the Bank's favor. This document consolidated the debtor's various outstanding loans and recited a principal debt of $314,225.72. The collateral listed in this security agreement gives the Bank a security interest in all the debtor's equipment, including the graders and the dozer liened to Courtney. Mr. Todd has testified that, at the time he prepared the two security agreements, he believed that it was questionable whether the value of the collateral would be sufficient to fully secure the debt owed to the bank.

At the conclusion of this meeting, Mr. Todd gave Courtney the security agreement and note which had been executed by the Crawfords in her favor. The Bank promptly recorded its lien in the Carlisle County court clerk's office on June 19, 1987. Courtney's lien was not perfected by filing in that office until August 8, 1988.

On May 4, 1988, the debtor filed its petition for Chapter 11 relief. Thereafter, on May 16, 1988, pursuant to this court's authorization, a public auction was conducted wherein the liened equipment was sold. Proceeds from the sale amounted to $131,512. Of that sum, $55,000 was realized from the two scrapers and the dozer. Following the Bank's motion for distribution of the escrowed auction proceeds to it, Courtney objected on the theory that the bank, by agreement, had subordinated its security interest to hers. Accordingly, the issue we now reach is which creditor, the Bank or Courtney, holds the senior lien in the scrapers and the dozer.

Certainly if this were simply a matter of determining order of priority based upon date of recordation of these creditors' liens, the Bank would prevail. However, Courtney advances two separate bases for her position that her lien should be senior to that of the Bank. She first asserts that, as a depositor of the Bank, she and the Bank occupied a fiduciary relationship. Because the Bank failed to inform her that it would not release its prior lien and that her interest would therefore occupy a junior position, Courtney avers, the Bank breached its fiduciary duty to her. Alternatively, Courtney contends that the Bank should be equitably estopped from asserting a senior lien, as it concealed material facts which, if known, would have prevented her from engaging in the loan transaction.

The Bank in response maintains that no fiduciary relationship existed between it and Courtney, at least with regard to the transactions here in issue. However, the Bank avers that if such a relation did exist, its duties to Courtney were not breached.

We note initially that, pursuant to 11 U.S.C. § 510(c), this court has the authority to restructure lien priorities in accordance with general principles of equitable subordination. To uphold a party's inequitable conduct by enforcing a lien derived therefrom would lend the court's imprimatur to such activity. Accordingly, we will not hesitate to restructure lien priorities as necessary to prevent inequities which may arise from a party's questionable conduct.

We have carefully considered the testimony of the interested parties in this matter, as well as arguments of counsel. In this court's opinion, the circumstances surrounding Courtney's extension of credit to the Crawfords were such that the Bank must be equitably estopped from asserting that it has a lien superior to the lien of Courtney.

Under the decisional law of Kentucky, a party who asserts the existence of an enforceable legal right may be equitably estopped from enforcement thereof in instances where a certain course of conduct is affirmatively proven by an opposing party. The elements which give rise to such an estoppel are:

"... (1) Conduct, including acts, language and silence, amounting to a representation or concealment of material facts; (2) the estopped party is aware of these facts; (3) these facts are unknown to the other party; (4) the estopped party must act with the intention or expectation that his conduct will be acted upon; and (5) the other party in fact relied on this conduct to his detriment."

*Gray v. Jackson Purchase Prod. Credit Assn.*, 691 S.W.2d 904 (Ky.App.1985).

As we review the testimony in this case, the scenario which emerges is clear. Courtney, a woman of little education and limited means, wanted to help her family members but, at the same time, also felt the pressing need to preserve her life savings, in order to meet her basic living expenses. She consulted a banker, with whom she had maintained an ongoing relationship, who assured her that she could obtain a lien which would "protect" her. With the assistance of bank officers[1] Courtney obtained a lien upon the debtor's equipment and the assurances of those officers that she was fully protected. She left the Bank believing that her interests had been preserved.

Watson had known Courtney for a number of years. Even if he had tried, he could not have avoided the inescapable conclusion that Courtney is uneducated and unsophisticated in legal matters, especially in matters as complex as lien recordation and priorities. Watson was also undoubtedly aware that the collateral underlying the Bank's loan was probably insufficient to fully secure the Bank's position. It is inconceivable to this court that Watson could have thought that the value of the liened equipment would be adequate to fully collateralize both the Bank and the Courtney loans. Thus it follows that, at the time he was purporting to help Courtney, Watson was fully apprised of the fact that Courtney's junior lien was not worth the paper it was upon which it was written, all the while leading her to reasonably believe that she was fully secured. The Bank's assertion that collateral was "not really an issue to Courtney" is not supported by the evidence. Accordingly, we find that Watson's failure to inform Courtney of the fact that he was not releasing his lien on the dozer and scrapers constituted an omission of a material fact which was known to him but which was unknown to Courtney. We find further that the omission was made with the intent that Courtney rely upon it, and that Courtney did so rely, to her detriment. Based upon the foregoing, we hold that the Bank is equitably estopped from asserting that its lien be accorded senior status to the lien of Courtney.

---

**1.** The court notes that the bank employee may well have committed the unauthorized practice of law in drafting the note and security agreement for Courtney.

Our previous discussion and conclusion renders it unnecessary for us to decide the issue of whether the Bank and Courtney were parties to a fiduciary relationship. We expressly decline to rule on that issue.

An order consistent with the opinion expressed herein will be entered this day.

This memorandum opinion constitutes findings of fact and conclusions of law in accordance with Fed.R.Civ.Pro. 52.

## ORDER

Pursuant to the attached memorandum opinion,

IT IS ORDERED that Marie Courtney shall receive the entire net proceeds from the sale of the two scrapers and one dozer in partial satisfaction of the debt owed to her.

IT IS FURTHER ORDERED that Bardwell Deposit Bank shall receive the net balance of the funds held in escrow by James R. Cash, Auctioneer, from the sale of all other mortgaged property held by the debtor on May 16, 1988, to be applied to the total debt owed to it by the debtor.

This is a final order.